IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAWN JAMES, | CASE NO. 1:24-cv-562 |
| Plaintiff, | DISTRICT JUDGE PATRICIA A. GAUGHAN |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Dawn James filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural background**

In October 2020, James filed an application for disability insurance benefits, alleging a disability onset date in February 2010.[1] Tr. 67. In pertinent

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

part, James alleged that she was disabled and limited in her ability to work due to ankylosing spondylitis,[2] asthma, mitral valve prolapse,[3] osteoarthritis, and Raynaud's syndrome.[4] *Id.* The Commissioner denied James's application initially and on reconsideration. Tr. 66, 81.

In June 2022, James requested a hearing. Tr. 112.  Administrative Law Judge (ALJ) Jeannine Lesperance held a telephonic hearing in March 2023. Tr. 33. James appeared, testified, and was represented by counsel at the hearing. *Id.* During the hearing, James's attorney amended her alleged onset date to January 2018, which was right before her 55th birthday. Tr. 39. Qualified vocational expert Karen Schneider also testified. Tr. 50. In April

---

[2]     Ankylosing spondylitis is an inflammatory disease that can cause vertebrae to fuse. This fusion makes the spine less flexible and, if ribs are affected, can cause difficulty breathing. *Ankylosing Spondylitis*, Mayo Clinic Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808 [**https://perma.cc/88G6-VJSF**].

[3]     Mitral valve prolapse is a heart valve disease that affects the valve between the left heart chambers and causes blood to sometimes leak backward across the valve, which is called mitral valve regurgitation. *Mitral Valve Prolapse*, Mayo Clinic Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/mitral-valve-prolapse/symptoms-causes/syc-20355446 [**https://perma.cc/HSH8-JTAU**].

[4]     Raynaud's syndrome is a disorder that affects the small blood vessels in fingers and toes, as well as nose, lips, or ear lobes. It causes the episodic spasms of those small blood vessels, called a vasospastic attack, in response to cold temperatures or stress. These spasms cause the skin to turn white, then blue and feel cold or numb and as the blood vessels relax, generally after about 15 minutes, the skin may turn red and feel tingly as the blood vessels. *Raynaud's Syndrome*, Cleveland Clinic Health Library, https://my.clevelandclinic.org/health/diseases/9849-raynauds-phenomenon, [**https://perma.cc/QF6G-VCPT**].

2023, the ALJ issued a written decision, which found that James was not entitled to benefits. Tr. 14.

In May 2023, James appealed the ALJ's decision to the Appeals Council. Tr. 178. In January 2024, the Appeals Counsel denied James's appeal, Tr. 1, making the ALJ's April 2023 decision the final decision of the Commissioner. Tr. 14–32; *see* 20 C.F.R. § 404.981.

James timely filed this action in March 2024. Doc. 1. In it, she asserts two issues for the Court's review:

> 1. Whether the ALJ erred when failing to identify substantial evidence supporting the residual functional capacity finding.
>
> 2. Whether the ALJ erred at step 4 when finding Plaintiff capable of performing past work performed at the light exertional level.

Doc. 9, at 1.

**Evidence**[5]

*1.      Personal, Educational, and Vocational Evidence*

James was 55 years old as of the amended alleged onset date of January 2018. Tr. 200. She graduated from high school and completed one year of college. Tr. 214.

*2.      Medical Evidence*

*i.      Evidence before January 9, 2018*

Throughout 2014 and early 2015, James sought treatment from Madhu Mehta, M.D. for ankylosing spondylitis, degenerative disc disease of the neck,

---

[5]      The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

and Raynaud's syndrome. Tr. 307–10, 312–24. In July 2014, James complained of symptoms of neck, shoulder, and low back pain along with stiffness and pain in her knees and feet. Tr. 307. James also described sleepiness when taking Soma. Tr. 307. On physical examination of James at the July 2014 appointment, Dr. Mehta assessed that James's ankylosing spondylitis appeared to be inactive and that James's back pain appeared to be associated with her degenerative disc disease. Tr. 309. During a November 2014 follow-up appointment, James described mental fog when taking Gabapentin, increased pain in her lower back, left hip, and both knees and ankles, all of which she said was "due to weather." Tr. 319. In February 2015, James reported that although she had some pain, it was "overall better" and that the combination of medication which she was taking "ha[d] been helpful in controlling symptoms." Tr. 322.

Between November 2015 and July 2017, rheumatologist Arthur Armstrong, M.D. treated James. Tr. 458–482. Dr. Armstrong's notes indicated that James had a past medical history of asthma, irritable bowel syndrome, neuropathy, ankylosing spondylitis, and cervical degenerative disc disease. Tr. 459. James's examination records showed joint tenderness and stiffness throughout her back, hips, legs, and hands. *See e.g.*, Tr. 461, 466, 471, 476. James was prescribed various medications to address her pain, however, some of them caused negative side effects. *See* Tr. 464, 467, 473. In July 2017, James reported pain and a recent flare-up due to humidity. Tr. 478–79. At that

appointment, James described her pain level as "5-6" out of ten and she was prescribed a Medrol dose pack for the flare-up. Tr. 479, 482.

From June 2016 through March 2017, primary care provider Sanjay K. Vora, M.D. treated James for various conditions including irregular heartbeat, hypertension, anxiety, and depression. Tr. 367–426. James had chest X-rays, which revealed mild thoracic disc degenerative changes with mild curvature. Tr. 383, 788. Dr Vora noted that James showed improvement with Metoprolol and he prescribed Paxil for generalized anxiety disorder. Tr. 394. He also prescribed Lorazepam to be taken as needed. Tr. 397.

In October 2016, James underwent breast reduction surgery. Tr. 746–64.

> ii.    *Medical Evidence between January 9, 2018, and  June 30, 2018*

In February 2018, James sought treatment from Dr. Vora for generalized anxiety disorder, high blood pressure disorder, heart pounding, and depression with anxiety. Tr. 427–30. She told Dr. Vora that she continued to see her rheumatologist, Dr. Armstrong, for ankylosing spondylitis. Tr. 429. James reported that she had briefly stopped taking Humira, but had re-started it. *Id.* She denied any activity change, arthralgias, or back pain. *Id.* James also reported stopping her psychotropic medication "several months back" because it was affecting her ability to stay focused. *Id.* An examination revealed "central obesity," but was otherwise normal, including a supple neck with normal range of motion. *Id.* Dr. Vora requested that James return for a follow-

5

up visit in April 2018, Tr. 430–431, however, she did not return until November 2018. Tr. 433.

### iii.    Medical Evidence after June 30, 2018

In October 2018, Dr. Armstrong noted that, due to high fevers and additional flare-ups, James had to stop taking Humira. Tr. 484. James opined that stress was adding to her flare-ups and estimated her pain level as "5-6" out of ten. Tr. 484. James's physical examination showed tenderness of the lumbar spine, some joints with decreased range of motion, and some lower extremity edema, but it also revealed that she had normal strength, sensation, and gait with negative straight leg raising. Tr. 486. James continued to seek treatment with Dr. Armstrong through at least September 2022. *See* Tr. 488–508, 532–59, 1226–86, 1318–23.

On examination during a November 2018 visit with Dr. Vora, James had central obesity and slight dysphoric mood. Tr. 430. Dr. Vora also prescribed Prozac at this appointment. *Id.* During both a November 2018 and a later March 2019 visit with Dr. Vora, James reported no symptoms or complaints related to ankylosing spondylitis, and denied any fatigue, joint swelling, neck stiffness, chest pain, palpitations, chest tightness, shortness of breath, photophobia, visual disturbances, hearing loss, or difficulty swallowing. Tr. 433–36, 440–43. At these visits, James's physical examinations remained normal except for her noted obesity. *Id.* James continued treatment with Dr. Vora through at least January 2023. *See* Tr. 440–53, 1003–1223.

6

### 3.  James's Work History Reports

James completed a work history report, submitted in October 2020, in which she reported that she worked as a nurse in a clinic from January 2002 through February 2010. Tr. 203. She indicated that in this position she worked eight hours per day, five days per week, and "gave injections saw over 100 patients per day." Tr. 206. James reported that she: walked for seven hours each day; sat for seven hours each day; reached for four hours each day; and typed, wrote, or handled small objects for seven hours each day. *Id.* James also explained that she lifted or carried supplies and patients, but that the heaviest she lifted was ten pounds and she lifted ten pounds frequently. *Id.*

In a second report, submitted in December 2020, James reported that she worked as a clinic nurse from September 1999 through February 2009. Tr. 235. She indicated that in this position she: worked eight hours per day; worked three days per week; and her duties included assessing the reason for a patient's visit, conducting various examinations, taking samples from patients, and inputting data into computers. Tr. 236. James explained that she lifted or carried "charts, supplies, medications, pamphlets, Glucometer 20ft." *Id.* The heaviest weight she lifted was ten pounds and she frequently lifted less than ten pounds. *Id.*

4.    *State Agency Consultants*

In December 2020, State agency reviewing physician, Gerald Klyop, assessed James's residual functional capacity (RFC)[6] with the following exertional limitations: "occasionally lift and/or carry" 20 pounds and ten pounds frequently; "stand and/or walk" for six hours in an eight-hour workday; sit for six hours in an eight-hour workday. Tr. 71. Dr. Klyop also found she could frequently: use controls with the bilateral upper and lower extremities; push and pull; climb ramps and stairs; climb ladders, ropes, and scaffolds; stoop, kneel, crouch, and crawl. Tr. 71. Dr. Klyop found no visual, manipulative, communicative, environmental, or balancing limitations. *Id.* Dr. Klyop concluded that James could perform her past relevant work as an LPN as actually performed. Tr. 72. On reconsideration, Dr. Klyop's findings were fully adopted by James Cacchillo, M.D., Tr. 77–79.

5.    *Hearing Testimony*

James's representative indicated at the administrative hearing that her onset date was amended to be January 9, 2018. Tr. 38. He also stated that James's job at the Frederick Smith Clinic consisted of "working as a nurse, giving a bunch of shots" and indicated that the "big, key component of this

---

[6]    An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

case" was whether she could "stand and walk six of eight hours" due to ankylosing spondylitis, which "may make or break us." Tr. 38-39.

James testified that she completed one year of college and obtained certification as a licensed practical nurse (LPN). Tr. 40. James stated that she previously worked as an LPN at Frederick Smith Clinic from 2003 to 2010. Tr. 41. James confirmed the accuracy of the ALJ's description of her duties, which included asking the reason for a patient's visit, taking vitals, checking blood sugar, chaperoning gynecological examinations, preparing patients for procedures, discharging patients, and getting medication samples for patients. Tr. 41–42. James also testified that during the "last years" of her time working at the Clinic, she worked in the injection room, where she saw up to 100 patients per day, administering one to two injections to each patient. Tr. 42. During this period, she stated that she stood eight to eight- and one-half hours per day; mostly lifted just the syringe and medication, but sometimes had to transport patients or help assist them to a chair; and had to respond to medical emergencies, sometimes requiring her to lift over 50 pounds. Tr. 42–43. James explained that she left this job to help care for her sick parents. *Id.*

James indicated that she was diagnosed with ankylosing spondylitis around 2005, at which time she underwent imaging that showed fused vertebra, mostly in her lower back. Tr. 45. The ALJ noted that in 2014, James's rheumatologist said her ankylosing spondylitis was in remission. Tr. 46. James could not remember her course of treatment for ankylosing spondylitis in 2018

or if it remained in remission from 2014 through 2018. *Id.* But she stated that it had "reasserted itself" by the time she went back to see Dr. Armstrong. *Id.*

James testified that her daily activities in 2017 and 2018 were generally as follows: working to settle her mother's estate; cleaning out her mother's things from an assisted living facility; some cleaning and cooking for herself; and sorting her mother's belongings from her parents' home so that she and her husband could move into her parent's home. Tr. 46.

On questioning by her representative,[7] James stated that, during her first couple of years working at the Franklin Smith Clinic, she administered injections and assisted patients. Tr. 47. James testified that on some days she sat more, doing paperwork, and going over things with patients, but on other days with a different doctor, she might stand more, administering shots or doing things with patients. Tr. 48. James stated that during this time she had problems standing for longer than 15 or 20 minutes at a time and experienced difficulty staking awake, finding words, or remembering things. Tr. 49. Later, on re-examination by her attorney, James testified that she "would say" she occasionally lifted 20 over pounds during her past work as an LPN. Tr. 61. She also stated, on re-examination by the ALJ, that "other than providing a partial assist for transferring a patient" there was nothing she did on a regular basis

---

[7]    It is apparent from review of the hearing transcript, there was some confusion caused by conflicting responses James provided regarding the intensity and certain aspects of her past work. Tr. 59–64. The ALJ, however, clarified this confusion during the hearing and addressed the reasoning behind her weighing of James's inconsistent responses in her decision. *See* Tr. 26–27.

as an LPN that would require her to lift over 20 pounds, Tr. 62; that the medical supplies she moved did not weigh over 20 pounds, Tr. 63; and that the only lifting, pushing, or pulling she would have done as an LPN was with patients, Tr. 63. When asked by the ALJ why she originally testified that she lifted less than ten pounds during this period, but later changed her testimony and stated she occasionally lifted over 20 pounds, James stated that her recollection was "kind of fuzzy" as to what her job required during that time. Tr. 62. She indicated that it was "kind of hard ... to say specifically, that it would be one-third of the day, that it was more than 20 pounds," and described her testimony as a "guesstimate." *Id.*

### 6.  *Vocational Expert*

At the administrative hearing, qualified vocational expert Karen Schneider testified that James's past relevant work is generally classified as medium work. Tr. 50. But Schneider explained that James actually performed this position at the light exertional level for a period of time and at the medium exertional level for a separate period of time. Tr. 50–51. In response to a hypothetical question from the ALJ, which included limitations identical to those in James's ultimate RFC, Schneider testified that the hypothetical individual could perform James's past relevant work as an LPN as actually performed at the light exertional level. Tr. 51–53.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act on June 30, 2018.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 9, 2018 through her date last insured of June 30, 2018. (20 CFR 404.1571 *et seq*.).

3.  Through the date last insured, the claimant had the following severe impairments: ankylosing spondylitis and obesity (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could stand and walk up to 6 hours in an 8 hour day, could occasionally climb ramps and stairs, kneel, crawl, and reach overhead; frequently stoop or crouch; and never climb ladders, ropes, and scaffolds or work at unprotected heights.

6.  Through the date last insured, the claimant was capable of performing past relevant work as a licensed practical nurse, as she actually performed the work. This work did not require the performance of work-related

activities precluded by the claimant's residual
functional capacity (20 CFR 404.1565).

7. The claimant was not under disability, as
defined in the Social Security Act, at any time
from January 9, 2018, the alleged onset date,
through June 30, 2018, the date last insured
(20 CFR 404.1520(f)).

Tr. 19–28.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence
of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the
"inability to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last for a continuous
period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.
§ 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a
disability determination:

1. Is the claimant engaged in substantial gainful
activity? If so, the claimant is not disabled.

2. Does the claimant have a medically
determinable impairment, or a combination of
impairments, that is "severe"? If not, the
claimant is not disabled.

3. Does the claimant's impairment meet or equal
one of the listed impairments and meet the
duration requirement? If so, the claimant is
disabled. If not, the ALJ proceeds to the next
step.

13

4.     What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.     Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficient[t] evidence' to support the agency's factual determinations." *Biestek*

14

*v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Before proceeding to the issues expressly raised in James's briefing, the Court notes that the relevant time period at issue is the approximately five-month window between January 9, 2018, which was James's alleged onset date, and June 30, 2018, which was the date she was last insured. *See Lorrison v. Berryhill*, No. 18-cv-10289, 2019 WL 1324247, at *6 (E.D. Mich. Mar. 25,

15

2019) ("the relevant period is the time between the onset date of plaintiff's alleged disability and his date last insured because social security insurance claimants must show that they are disabled on or before the date last insured"). James's reply brief appears to argue, without supporting citation, that the ALJ was not limited to only consider the chronologically relevant five-month period. Doc. 12, at 1. To this end, James cites generally applicable regulations that require the ALJ to consider the entire record. *Id.* at 2–3. As discussed below, James doesn't show that the ALJ failed to consider the entire record. And, while the ALJ may not have been *confined* to consider only the relevant five-month period of disability that James has alleged, *see Lorrison*, 2019 WL 1324247, at *6, James does not appear to dispute the fact that she had the burden to demonstrate that she suffered from a disability during the period alleged. She also does not dispute that it was the ALJ's obligation to weigh the evidence.

### *1. James has not shown that the ALJ erred in her RFC assessment.*

*1.1.* James divides her argument about the ALJ's RFC assessment into two parts, the first half of which is captioned as concerning "subjective allegations." Doc. 9, at 10. As to the *subjective allegations* component of James first argument, she asserts ALJ erred by "failing to identify substantial evidence supporting the residual functional capacity finding." Doc. 9, at 9. Unfortunately, James's presentation is confusing and largely irrelevant. For starters, her argument appears focused on the evidence or lack of evidence

supporting a condition—ankylosis spondylosis—*which the ALJ found that James had*. And she begins her RFC challenge by faulting the ALJ's step-two analysis of James's medically determinable impairments. Doc. 9, at 10. Because James does not purport to present a challenge to the ALJ's step-two analysis of James's medically determinable impairments, the Court interprets James's assertion of error as providing context for her RFC challenge.[8]

As to James's RFC challenge, she focuses on the ALJ's observation, when assessing James's RFC, that although the ALJ had "adopt[ed] ankylosis spondylosis as a medically determinable impairment," the record "offer[ed] very little in the way of truly objective findings[,] such as imaging of the spine[,] to establish the diagnosis."[9] *Id*. at 11–12; Tr. 25.

James seemingly takes issue with the ALJ's observation, arguing that "the record contains imaging evidence consistent with [her] allegations." Doc. 9, at 11. But James doesn't actually point to any imaging in the record that would "establish the diagnosis." Instead, she notes that in 2014, Dr. Mehta

---

[8]     The Court's initial order directed that "[e]ach introductory heading in the Argument or Analysis section of a brief must correspond to the argument presented under the heading." Doc. 4, at 3. So it would be improper to bury a step-two argument under a heading describing an RFC challenge.

[9]     The ALJ made this observation with reference to "the SSR 16-3p factors." Tr. 25. Social Security Ruling 16-3p provides that to evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. James does not specifically claim that the ALJ misapplied Ruling 16-3p.

reviewed a previous x-ray—taken on an unknown date and not actually in the record—that revealed degenerative disc disease and "very minimal sacroiliitis." *Id*. at 12; Tr. 309. She then points to x-rays of James's chest, hip, left knee, and abdomen. Doc. 9, at 12. So James hasn't established what may be her premise—that the record contains imaging objectively establishing her diagnosis.[10]

Additionally, James ignores the fact that despite the ALJ's observation, she nonetheless gave James "the benefit of the doubt" and "adopt[ed] ankylosis spondylosis as a medically determinable impairment." Tr. 35. So it's not evident that the ALJ's observation had any influence at all on her RFC assessment. Indeed, James doesn't explain how the ALJ's observation negatively affected her, especially considering that the ALJ's consideration of the SSR 16-3p factors—in which she noted the lack of imaging—was but one part of the ALJ's three-page RFC assessment.[11] *See* Tr. 23–26.

---

[10] James concedes that the ALJ discussed some of the imagining evidence which she referenced earlier in the ALJ's decision. Doc. 9, at 12. She faults the ALJ for not specifically repeating the discussion in relation to the RFC assessment. *Id*. But the ALJ was not required to repeat that discussion. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016).

[11] Confusingly, in the middle of her RFC challenge, James again faults the ALJ's step-two observation that the record contained "very minimal treatment records from the amended alleged onset date to the date of last insured." Doc. 9, at 12; Tr. 21. According to James, the ALJ erred in this regard because James "consistently complained of pain in the back, neck, hips, knees, and multiple other joints." Doc. 9, at 12. But James again doesn't point to treatment records from the relevant time period. So She hasn't shown error.

Later, James asserts that "the record contains clinical findings on examination consistent with Plaintiff's allegations." Doc. 9, at 13. James doesn't specify the allegations to which she refers but the block quote which follows this assertion concerns her diagnosis of ankylosis spondylosis, about which the ALJ gave her the benefit of the doubt. But even putting that fact aside and assuming that James is referring to a different, unnamed diagnosis, the fact that evidence exists that might support a claimant's allegations does not mean that a contrary finding by the ALJ that is not supported by substantial evidence. *Jones*, 336 F.3d at 477. James does not appear to acknowledge or attempt to overcome this fact throughout her brief.

James next sets up straw man. She notes that at that end of the ALJ's discussion of the SSR 16-3p factors—in the middle of the ALJ's RFC assessment—the ALJ stated that James had "testified that imagining at the time of her initial diagnoses in 2005 showed fusion of some of her lower lumbar vertebrae." Tr. 25. Without expressly saying it, James implies that the ALJ doubted James's testimony and was thus required to obtain imagery of James's spine. Doc. 9, at 13. There are a few problems with this line of argument.

For starters, the ALJ made this statement in the context of giving James the benefit of the doubt that, despite the lack of imaging to support the diagnosis of ankylosis spondylosis, she had ankylosis spondylosis. Tr. 25. Why the ALJ would have needed to obtain imaging to support a diagnosis that she accepted is a mystery that James does not answer.

19

Further, James was represented by counsel and she has pointed to nothing that would have prevented her from developing and presenting her evidence in support of her burden. *See Moats v. Comm'r of Soc. Sec.*, 42 F. 4th 558, 563 (6th Cir. 2022) ("while the ALJ must ensure that every claimant receives 'a full and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant") (citation omitted), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023). "Absent … special circumstances" not claimed here, the ALJ did not have a "heightened duty … to develop the record." *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); *see Moats*, 42 F.4th at 564 ("absent … acute circumstances, we do not 'heighten' the ALJ's fact-finding responsibility, even where a claimant is unsophisticated and appears without counsel").[12]

Additionally, the ALJ's statement is accurate and the ALJ's decision describes why it is accurate. Specifically, the only imaging that purportedly showed fixation of the spine, was taken in 2005 and the ALJ only learned of this imaging through James's testimony. Tr. 25. Even still and as noted, the ALJ gave James the benefit of the doubt and found that ankylosis spondylosis was a severe medically determinable impairment based on her "longstanding

---

[12] Although *Moats* represents controlling authority directly contrary to James's argument, she does not cite it. The Court trusts that her counsel will not fail to cite it in the future when presenting a similar argument. *See* LR 83.7(a) (Attorneys admitted to practice in this Court shall be bound by the ethical standards of the Ohio Rules of Professional Conduct); Ohio R. Pro. Resp. 3.3(a)(2).

diagnosis endorsed by multiple rheumatologists and the state agency[.]" *See* Tr. 20.

James next argument in support of the *subjective allegations* component of her first issue is that "the record contains clinical findings on examinations consistent with [her] allegations." Doc. 9, at 13. To this end, James appears to argue that the ALJ erred by giving too much weight to the imaging evidence compared to other clinical findings contained with the record. *Id.*, at 13–14. As an initial issue, however, this argument fails because it is the ALJ's the duty to weigh the record evidence. 20 C.F.R. § 404.1520c(a) (explaining how *the ALJ* will consider and weigh medical opinions and prior administrative medical findings); *see also Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020) ("this court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job.").

Perhaps recognizing that the ALJ's role is to weigh the evidence, James asserts that "the ALJ failed to explain how the clinical findings were insufficient to support the veracity of [her] allegations." Doc. 9, at 15. This argument is belied by the ALJ's decision. When the ALJ addressed the persuasive value of James's subjective complaints, she adequately articulated her reasoning. The ALJ described the evidence of record, explained that James's subjective complaints were generally unpersuasive and inconsistent, and then proceeded to articulate several pages of medical evidence and other findings to support her finding. *See* Tr. 23–26. The ALJ also stated several

times that she considered the entire record. *See e.g.*, Tr. 18. James presents nothing that would lead the Court to question ALJ's statements to this effect. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021) ("We … presume the agency has considered all the evidence and properly discharged its duties."); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Further, James's citation to evidence in the record which she believes may support a different conclusion does not mean that the ALJ's decision was not supported by substantial evidence. *See Jones*, 336 F.3d at 477.

James's final argument in support of the first half of her first issue is that "the ALJ did not consider the side effects, medication changes, and well documented symptomology relating to fatigue exhaustion, and difficulty staying awake in the record." Doc. 9, at 17. Assuming this argument has something to do with James RFC, the ALJ did consider these matters. Again, the ALJ stated that she considered the entire record and James's makes no argument that would lead the Court to discount the ALJ's statement that she complied with applicable regulations. *See Newark Elec. Corp.*, 14 F.4th at 163. Additionally, review of the ALJ's decision shows that she considered James's history of medications, including side effects, and the symptomology described.

22

*See e.g.*, Tr. 22–25 (including discussion of medication management in relation to mental and physical conditions).

For all of these reasons, James's *subjective allegations* challenge to the ALJ's RFC assessment fails.

*1.2.* The second half of James's RFC challenge concerns "combined effects of impairment." Doc. 9, at 19. James begins by discussing the ALJ's step-two analysis of James's medically determinable impairments. *Id*. She notes that the ALJ held that James's "medically determinable mental impairments of a depression disorder and an anxiety disorder, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere." Tr. 22. She asserts that the ALJ failed to consider her mental impairments after step two, and "the ALJ failed to consider the combined effects of Plaintiff's severe and nonsevere impairments." *Id*. In this regard, she asserts that "'[i]f the ALJ discusses an impairment in the [S]tep [T]wo severity analysis, and finds the impairment to be nonsevere, he or she must still consider the impact of any non-severe limitation in the RFC analysis." Doc. 9, at 20–21 (citation omitted). Notably, James has not challenged the determination that any mental impairments that she had "did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and were therefore nonsevere." Tr. 22. Nor has she challenged the

determination that she had only a mild limitation in one of the four functional areas set out for evaluation of mental disorders. *See id.*

Under Social Security Ruling 96-8p, when considering an RFC, an ALJ:

> must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P, 1996 WL 374184, at *5 (July 2, 1996). According to James, the ALJ failed to follow this requirement because she only discussed one treatment note from November 2018, Doc. 9, at 21, which showed that James's "depression and anxiety were well controlled with medications," Tr. 25. According to James, the ALJ failed to discuss a host of other mental status evidence from outside the relevant time period.[13] Doc. 9, at 21–22 (describing evidence).

The first problem with this aspect of James argument is that the record belies it. During her step-two analysis, the ALJ spent a page detailing the evidence James says that the ALJ ignored. Tr. 22. She was not required to

---

[13]    For reasons that James does not explain, James includes in this discussion evidence about certain of her physical issues. Doc. 9, at 22.

repeat this discussion during the RFC discussion. *See Crum*, 660 F. App'x at 457. And during the RFC discussion, the ALJ remarked—as noted—that by November 2018, James's conditions were under control. Tr. 24. James points to no subsequent contrary evidence. Undisputed evidence that James's conditions were under control constitutes substantial evidence supporting the decision not to include mental limitations in the RFC. Further, James ignores in her opening the brief the fact the ALJ also relied on the state agency psychological assessments. Tr. 26.

Moreover, the fact that the ALJ was required to consider James's non-severe mental impairments does not mean that she was required to include them in the RFC. Indeed, the ALJ found that James had no limitation in three of four areas of functioning, and only a mild limitation in the fourth area. In this circumstance, the ALJ was not required to include additional limitations in the RFC. *See Zingale v. Kijakazi*, No. 20-cv-2197, 2022 WL 824148, at *12 (N.D. Ohio Mar. 18, 2022).

*2. Substantial evidence supports the ALJ's step-four analysis.*

In her second issue, James asserts that the ALJ erred at Step Four when she found that James was capable of performing her past work, as performed at the light exertional level. Doc. 9, at 22–25.

This argument is essentially that the ALJ's assessment that James performed her past relevant work, at least in part, at a light exertional level was not supported by substantial evidence. To this end, James asserts that the

record "does not show that [James] had performed work as a Licensed Practical Nurse at the light exertional level from 2003–06 at the Frederick Smith Clinic." Doc. 9, at 23. But it is the role the ALJ's role to weigh the record evidence and James's testimony to determine whether James was capable of performing her past work. Without showing that the ALJ's determination was not supported by substantial evidence, there is no basis to remand.

James asserts that "there is no testimony regarding" the ALJ's "impression that 'the earlier job was done at light.'"[14] Doc. 9, at 25. The ALJ, however, elicited testimony from both James and the vocational expert to support her assessment that part of James's past work was performed at the light exertional level. *See e.g.,* Tr. 52–53, 59, 62 ("my recollection … is kind of fuzzy … [a]nd … it's kind of hard for me to say … that it was more than 20

---

[14]    Applicable regulations provide:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

pounds … [i]t's just a guesstimate"). Indeed, on clarification, the vocational expert testified that James performed her job at the light exertional level. Tr. 52–53 ("as you clarified, I would say, then yes[,] [s]he was performing at the light [exertional level] and that job could be done"). And additional subsequent questioning of James tended to support this determination. *See* Tr. 61–63.

Additionally, review of James's work history report further supports a finding that James performed her past work as an LPN at the light exertional level. *See* Tr. 236 (self-reporting that the heaviest weight lifted was less than 10 pounds and that the weight frequently lifted was less than 10 pounds). The testimony elicited and James's work history report both support the ALJ's finding that she performed her past work at the light exertional level. And the ALJ said as much in her decision. *See* Tr. 25–27.

As the ALJ noted, the evidence on this point was confused and somewhat contradictory. *See* Tr. 60. The fact that there was somewhat inconsistent testimony does not, however, mean that the ALJ's determination that James could perform past work at the light exertional level was unsupported by substantial evidence. Instead, it was up to the ALJ to resolve those inconsistencies by weighing the evidence. 20 C.F.R. § 404.1520c(a) (explaining how *the ALJ* will consider and weigh medical opinions and prior administrative medical findings); *see also Rottmann*, 817 F. App'x at 196 ("this court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job.").

In sum, James has not shown that the ALJ acted improperly or made a finding unsupported by substantial evidence by weighing the contradictory evidence and rendering her ultimate RFC determination.

**Conclusion**

For all of the reasons stated, I recommend that the Court affirm the Commissioner's decision.

Dated: October 22, 2024

/s/ *James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).